**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CLASS REPRESENTATION

AMANDA PEREZ, and
MICHAEL GREGORIO,

       Plaintiffs,                          CASE NO.:

vs.

THE SCOTTS COMPANY, LLC,
and WALMART INC.,

       Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs, AMANDA PEREZ and MICHAEL GREGORIO (hereinafter collectively referred to as "Plaintiffs"), individually, and on behalf of all others similarly situated in Florida, by and through the undersigned counsel, hereby file this Class Action Complaint against Defendant, THE SCOTTS COMPANY, LLC (hereinafter "THE SCOTTS COMPANY"), and Defendant, WALMART INC. (hereinafter "WALMART") (THE SCOTTS COMPANY and WALMART are hereinafter collectively referred to as "Defendants"), and allege as follows:

### I.    JURISDICTION & VENUE

1.    This Court has jurisdiction over the subject matter presented by this Class Action Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest

and costs. Pursuant to 28 U.S.C. § 1332(d)(2)(A), Plaintiffs allege that the total claims of the members of the Plaintiffs' Classes in this action are in excess of $5,000,000.00, in the aggregate, exclusive of interest and costs, and as set forth below, diversity of citizenship exists under CAFA because, as more fully set forth below, Plaintiffs are citizens of Florida, THE SCOTTS COMPANY can be considered a citizen of Ohio, and WALMART can be considered a citizen of Arkansas. Based on public sales data and on information and belief, nationwide sales of the Orthene fire ant killer1 products at issue in this lawsuit over the most recent four-year period, Plaintiffs have a good faith basis to plead that the total claims of the Plaintiffs' Classes (Florida residents) exceed $5,000,000.00.

2.      Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(a) because, as set forth below, Defendants conduct business in, and may be found in, this district, and Plaintiffs purchased the subject Product in this judicial district.

**II.    PARTIES**

3.      Plaintiff, AMANDA PEREZ, is an individual consumer over the age of eighteen (18), who resides in Broward County, Florida. Plaintiff seeks injunctive relief and damages on behalf of Plaintiff and the Class, and respectfully requests a jury trial as to damages.

4.      Plaintiff, MICHAEL GREGORIO, is an individual consumer over the age of eighteen (18), who resides in Broward County, Florida. Plaintiff seeks injunctive relief and damages on behalf of Plaintiff and the Class, and respectfully requests a jury trial as to damages.

5.      Defendant, WALMART, is one of the retailers in the United States, and maintains its principal executive offices in Arkansas, which at all times material hereto

was registered and conducting business in Florida, maintained agents for the customary transaction of business in Florida, and conducted substantial and not isolated activity within this state.

6.      Defendant, THE SCOTTS COMPANY, is one of the largest manufacturers of lawn care products worldwide and maintains its principal executive offices in Marysville, Ohio, which at all times material hereto was registered and conducting business in Florida, maintained agents for the customary transaction of business in Florida, and conducted substantial and not isolated activity within this state.

7.      THE SCOTTS COMPANY manufactures, markets, promotes, advertises and sells Orthene fire ant killer1 products, including the Orthene product at issue in this Action, including manufacturing and distributing the Orthene product at issue in this Action for sale at WALMART.

8.      WALMART markets, promotes, advertises and sells Orthene fire ant killer1 products, including the Orthene product at issue in this Action.

9.      The advertising and labeling for the Orthene Fire Ant Killer1 (Net Wt. 12oz / 340g) (hereinafter the "Product") purchased by Plaintiffs were prepared and/or approved by THE SCOTTS COMPANY and its agents and was disseminated by THE SCOTTS COMPANY and its agents through advertising and labeling containing the misrepresentations and omissions alleged herein.

10.     As a distributor and retailer of the Product, WALMART and its agents disseminated the Product purchased by Plaintiffs though advertising and labeling containing the misrepresentations alleged herein.

11.     The advertising for the Product was designed to encourage consumers to

purchase the Product and misled reasonable consumers, including Plaintiffs and the Class, into purchasing the Product.

12.    THE SCOTTS COMPANY markets and distributes the Product and is the company that created and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive advertising and statements about the Product.

13.    WALMART markets and distributes the Product through its status as a retailer of the Product and authorized the unlawful, fraudulent, unfair, misleading and/or deceptive advertising and statements about the Product after it received notice from Plaintiffs (dated October 25, 2023) of THE SCOTTS COMPANY's unlawful, fraudulent, unfair, misleading and/or deceptive advertising and statements about the Product, and continued to market, promote advertise and sell the Product. As more fully described herein, upon receipt of Plaintiff's Notice Letter, WALMART had actual knowledge of the unlawful, fraudulent, unfair, misleading and/or deceptive advertising and statements about the Product, and elected to continue to market, promote, advertise and sell the Product, by selling it in its stores in Florida and across the United States, in violation of Florida's Deceptive and Unfair Trade Practices Act.[1]

14.    Plaintiffs allege that, at all times relevant herein, WALMART and its subsidiaries, affiliates, and other related entities and suppliers, as well as their respective employees, were the agents, servants, and employees of WALMART and at all times relevant herein, each was acting within the purpose and scope of that agency and employment.

---

[1] A copy of said Notice Letter sent to WALMART, as well as all attachments to the Notice Letter (including the laboratory report from an accredited lab reflecting the product shortage), is attached hereto as **Exhibit "G."**

15. Plaintiffs allege that, at all times relevant herein, THE SCOTTS COMPANY and its subsidiaries, affiliates, and other related entities and suppliers, as well as their respective employees, were the agents, servants and employees of THE SCOTTS COMPANY and at all times relevant herein, each was acting within the purpose and scope of that agency and employment.

16. In addition, Plaintiffs allege that, in committing the wrongful acts alleged herein, WALMART, in concert with its subsidiaries, affiliates, and/or other related entities and suppliers, and their respective employees, planned, participated in and furthered a common scheme to induce members of the public to purchase the Product by means of untrue, misleading, deceptive, and/or fraudulent representations, and that WALMART participated in the making of such representations in that it created those representations, as well as disseminated those misrepresentations and/or caused them to be disseminated.

17. In addition, Plaintiffs allege that, in committing the wrongful acts alleged herein, THE SCOTTS COMPANY, in concert with its subsidiaries, affiliates, and/or other related entities and suppliers, and their respective employees, planned, participated in and furthered a common scheme to induce members of the public to purchase the Product by means of untrue, misleading, deceptive, and/or fraudulent representations, and that THE SCOTTS COMPANY participated in the making of such representations in that it created those representations, as well as disseminated those misrepresentations and/or caused them to be disseminated.

18. Whenever reference in this Class Action Complaint is made to any act by WALMART or its subsidiaries, affiliates, distributors, retailers and other related entities

and suppliers, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of WALMART committed, knew of, performed, authorized, ratified and/or directed that act or transaction on behalf of WALMART while actively engaged in the scope of their duties.

19.     Whenever reference in this Class Action Complaint is made to any act by THE SCOTTS COMPANY or its subsidiaries, affiliates, distributors, retailers and other related entities and suppliers, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of THE SCOTTS COMPANY committed, knew of, performed, authorized, ratified and/or directed that act or transaction on behalf of THE SCOTTS COMPANY while actively engaged in the scope of their duties.

## II.     FACTUAL ALLEGATIONS

20.     On or about February 2, 2023 Plaintiff, AMANDA PEREZ, purchased Orthene Fire Ant Killer1 (Net Wt. 12oz / 340g) at a Home Depot store located at 1000 NE 4th Avenue, Fort Lauderdale, FL, 33304. A copy of the Receipt is attached hereto as **Exhibit "A."**

21.     On or about February 3, 2024 Plaintiff, MICHAEL GREGORIO, purchased Orthene Fire Ant Killer1 (Net Wt. 12oz / 340g) at a WALMART store located at 2300 W Atlantic Blvd, Pompano Beach, FL, 33069. A copy of the Receipt is attached hereto as **Exhibit "B."**

22.     The Product is an insecticide, provided to consumers for the purpose of being measured and placed on fire ant beds according to its label instructions with the promise of killing the queen and destroying the mound.

23.     The Product's front label prominently states that the Product **"TREATS UP TO 162 MOUNDS"** and that it **"KILLS THE QUEEN & DESTROYS THE MOUND."** The front label of the product is shown below:




24.     The Product's labeling explicitly directs consumers, such as Plaintiffs, on how to measure the dry acephate powder / "Orthene fire ant killer1" in order to treat each "ant mound." Images of the Product label and its measuring instructions are attached and incorporated hereto as **Exhibit "C."**

25.     As demonstrated by the Product label, the minimum measurement required to treat an "ant mound" (of less than 4" in diameter) is 1 teaspoon of dry acephate powder

/ "Orthene fire ant killer1."  Therefore, in order for the Product to be capable of treating "162 MOUNDS," the Product must contain at least 162 teaspoons of dry acephate powder / "Orthene fire ant killer1."

26.    Based on this prominent labeling and based on the measuring and treatment instructions listed on the Product, a consumer purchasing this Product would reasonably believe that the Product contains at least 162 teaspoons of dry acephate powder / "Orthene fire ant killer1."

27.    The fact that THE SCOTTS COMPANY prominently advertises the number of fire ant mounds it allegedly treats on the front label of the Product, indicates its knowledge that this information is material to reasonable consumers.  This is no different than buying a product that promises to contain 100 screws, 12 eggs, or 8 biscuits and then discovering fewer than the promised number have been provided.

28.    Despite this prominent packaging and labeling, the Product does not contain 162 teaspoons or more dry acephate powder / "Orthene fire ant killer1" to treat the "162 MOUNDS" as promised, thereby rendering these representations deceptive as they are false and misleading.

29.    Expert testing on the Product, which is attached hereto and incorporated herein as **Exhibit "D,"** establishes that the Product (despite its prominent labeling representations) provides 13% fewer fire ant mound treatments than represented to consumers on the Product's label—that is 21 fewer treatments than promised.

30.    Since Plaintiffs purchased the Product as a product advertising itself as being able to treat 162 fire ant mounds, and it was not such a product, Plaintiffs were damaged in proportion to the treatments of dry acephate powder / "Orthene fire ant killer1

not received.

31.     Specifically, Plaintiffs and other consumers of the Product, were cheated out of 13% of the fire ant mound treatments they paid for based on the advertising, marketing, and labeling of the Product.

32.     The Product's representations, as outlined and explained above, which are uniformly, consistently, and prominently displayed on each individual package of the Product are untrue, misleading and deceive the public. In making this allegation that the representations on the packaging regarding the number of fire ant mound treatments contained in the package are untrue, Plaintiffs rely upon independent laboratory testing, attached as **Exhibit "D,"** showing that there are 13% fewer fire ant mound treatments than represented, meaning that 13% of the promised treatments are not delivered to Plaintiffs and the putative classes.

33.     In addition to the representation that the Product contains sufficient dry acephate powder / "orthene fire ant killer1" to treat "162 MOUNDS," the front label of the Product prominently states that it **"KILLS THE QUEEN & DESTROYS THE MOUND."**

34.     Contrary to the representations made on the Product's front label, the Product's promised efficacy does not match reality.

35.     The Product is comprised of dry acephate powder (as opposed to water-based treatments) and the Product's label explicitly states "NO WATERING IN!" However, dry acephate powder is ineffective for fire ant treatment aimed at killing the entire colony and the queen(s).

36.     Specifically, dry acephate is a contact killer, so when the powder is applied to the mound, it may kill worker fire ants on the surface but will rarely be taken to a queen

and kill her. In effect, as one entomologist stated, "the only guarantee of Orthene is that it is guaranteed to make the mound move."

37.     Further, while the Product may on rare occasion "KILL THE QUEEN", the Product's label fails to even suggest that many fire ant mounds contain more than one queen. This is important because the majority of fire ant colonies in the United States are polygyne colonies, meaning that each colony has more than one queen.  A report authored by Dr. Linda M. Hooper-Bui, which highlights the inefficacy of dry acephate powder for fire ant control is attached hereto as **Exhibit "E,"** and is incorporated fully herein.

38.     The fact that most fire ant colonies are multi-queen colonies, coupled with the fact that dry acephate powder is ineffective in treating fire ant colonies, means that numerous treatments of the Product will be needed, as the surviving queen and other surviving portions of the mound will simply move the mound to a nearby location.

39.     The Product's back label does not clear up the confusion caused by the front label's representations. The back label of the Product is shown below:

[Intentionally left blank]



**DIRECTIONS FOR USE:** It is a violation of Federal law to use this product in a manner inconsistent with its labeling. Do not apply this product in a way that will contact people or pets.

**IMPORTANT:** To be used only as a mound treatment for home lawns and as a mound treatment around ornamental plants (including flowers, trees and shrubs).

**PRODUCT FACTS 1 Tablespoon (Tbsp) = 3 teaspoons (tsp)**

**WHERE TO USE** • As a mound treatment for home lawns and around ornamental plants (including flowers, shrubs & trees)

**KILLS INSECTS: Fire Ants**

| HOW TO APPLY | Mound size (in diameter) | Amount to Use (per mound) |
|---|---|---|
| • Sprinkle dry powder over each mound. (refer to table for amount to use). • DO NOT WATER-IN. • Try not to disturb the mound while treating. | Less than 4" | 1 teaspoon/tsp |
| | 4" to 12" | 4 teaspoons/tsp |
| | Greater than / > 12" | 3 Tablespoons/Tbsp |
| | | 1 Tablespoon/Tbsp = 3 teaspoons/tsp |

**WHEN TO APPLY** • For best results, apply when ants are active. Applications made under prolonged hot and dry conditions may be ineffective due to location of ants deep in the nest. • Do not apply during heavy dew or just before a rain. • Treat new mounds as they appear.

Do not allow people or pets to enter treated area until dusts have settled.

**INSECTOS QUE ELIMINA: Hormigas de fuego**

| CÓMO APLICAR | Tamaño del montículo (diámetro) | Cantidad a utilizar (por montículo) |
|---|---|---|
| • Espolvoree el producto seco sobre cada uno de los montículos. (consulte la cantidad a utilizar en la tabla). • NO REGAR. • Trate de no alterar el montículo mientras aplique el tratamiento. | Menos de 4 pulgadas (10 cm) | 1 cucharadita/tsp |
| | Entre 4 y 12 pulgadas (10 a 30 cm) | 4 cucharaditas/tsp |
| | Más de / > 12 pulgadas (30 cm) | 3 cucharadas/Tbsp |
| | | 1 cucharada/Tbsp = 3 cucharaditas/tsp |

**STORAGE AND DISPOSAL**

Store pesticide in original container. Store in a cool, dry place, out of reach of children, pets and livestock.

Empty: Nonrefillable. Do not reuse or refill this container. Offer for recycling if available. If recycling is not available, discard the product in the trash.

Do not dispose of this product down any indoor or outdoor drain.

**PRECAUTIONARY STATEMENTS**

**HAZARDS TO HUMANS & DOMESTIC ANIMALS**

**CAUTION** Causes moderate eye irritation. Avoid contact with eyes and clothing. When handling this product, wear protective eyewear, long pants, socks and chemical resistant gloves made of waterproof material. Wash the outside of the gloves with soap and water before removing. Wash hands before eating, drinking, chewing gum, using tobacco or using the toilet. Remove contaminated clothing and wash clothing before reuse.

**FIRST AID**

**If in eyes:** Hold eye open and rinse slowly and gently with water for 15-20 minutes. Remove contact lenses, if present, after first 5 minutes, then continue rinsing eye. Call a poison control center or doctor for treatment advice. Have the product container or label with you when calling a poison control center or doctor. For emergency information call 1-800-225-2883. Acephate is a cholinesterase inhibitor. Atropine is an antidote. 2-PAM is also antidotal. Treat symptomatically. If in conjunction with atropine but

**ENVIRONMENTAL HAZARDS**

This pesticide is toxic to birds. Do not apply directly to water. Do not contaminate water when disposing of equipment washwaters or rinsate. To protect the environment, do not allow pesticide to enter or run off into storm drains, drainage ditches, gutters or surface waters. Applying this product in calm weather when rain is not predicted for the next 24 hours will help to ensure that wind or rain does not blow or wash pesticide off the treatment area. Cover or soil-incorporate spills.

**NOTICE:** To the extent consistent with applicable laws, buyer assumes all risks of use, storage or handling of this product not in accordance with directions.

**NOTE:** This package is sold by weight. Contents may have settled during shipment.

**Questions or Comments**
**call 1-800-225-2883**

www.ortho.com

If for any reason you, the consumer, are not satisfied with this product, mail us your original proof of purchase to obtain a full refund of your purchase price.

The **ORTHO®** Guarantee

©2016 The ORTHO Group.
World rights reserved.

Sold by **The ORTHO Group**
P.O. Box 190
Marysville, OH 43040

EPA Reg. No. 239-2632
EPA Est. No. 84175-TX-1A, 85652-OH-1W
Superscript is first letter of lot number.

0 71549 05835 9
1045

L88814

40.    The back label reaffirms the representations on the front label of the Product. The back label makes no clarifying statement that multiple treatments may be necessary as the queen, and the surviving portion of the mound, move to an adjacent mound. Rather, the back label instructs a user to measure the mound then measure and apply the appropriate amount of dry powder over each mound depending on its size.  The label reminds the user to do otherwise, "is a violation of federal law."

41.    THE SCOTTS COMPANY is well aware that dry acephate powder, standing alone, is ineffective for treating fire ant colonies and does not kill the queen. In fact, Scotts, through its Ortho website, acknowledges that "2-steps" are needed to effectively treat fire ant colonies and to actually kill the queens.  This "2-Step" program requires consumers to use **both:** (1) the Product; and (2) Ortho's Fire Ant Killer Broadcast Granules ("Broadcast Granules"), an expensive and time-consuming undertaking. A screen-capture from Ortho's website depicting the Fire Ant 2-Step Program is shown below:



42.    Unfortunately, the ineffectiveness of the Product cannot be ascertained from the statements THE SCOTTS COMPANY chose to include on the Product label.

43.    THE SCOTTS COMPANY intentionally failed to disclose to consumers, on the Product label, that a second step, purchasing and utilizing Ortho's Fire Ant Killer

Broadcast Granules, in addition to purchasing and utilizing the Product is necessary to effectively treat fire ant mounds.

44.    The front label of Ortho's Fire Ant Killer Broadcast Granules is depicted below:



45.     With Broadcast Granules, the consumer purportedly is able to "control[] fire ants for 6 months." The benefit of this product is the second step to ridding one's yard of fire ants by preventing the mound from simply moving to an adjacent area of the consumer's yard (which will occur if the consumer uses the Product by itself).   This is achieved by the use of a different active ingredient than is present in Orthene. Instead of acephate, Broadcast Granules contain Bifenthrin. The back label of the Broadcast Granules package is shown below:



46.     Broadcast Granules call for the consumer to, for best results, "[d]on't treat just the infested areas of the lawn where mounds are visible. Treat the entire lawn area to control reinfestation of fire ants from neighboring areas… [c]ontrol will be optimized by combining broadcast application that will control foraging workers and newly-mated fly-in queens with mound treatments that will kill existing colonies."  This specific language from back label of the Broadcast Granules package is demonstrated below:



47.     THE SCOTTS COMPANY intentionally omitted from the Product's label that a second step, and a second and different product, which second product does have to be watered in, is required for the consumer to effectively "KILL THE QUEEN & DESTROY THE MOUND." There is no mention of Broadcast Granules on the Product's label. There is also no mention of "Step 2" on the Product's label.  Simply stated, there is no way for a consumer to know that despite the Product's claim that it "KILLS THE QUEEN & DESTROYS THE MOUND," they will have to purchase another product to actually kill the queens and get rid of fire ants in a consumer's yard.   Therefore, the Product's representation that it "KILLS THE QUEEN & DESTROYS THE MOUND," is false, deceptive, and misleading, as the Product by itself does not live up to the representations. The Product merely causes the mound to relocate to an adjacent area.

48.     Importantly, statements disclosing the two-step process including the need for broadcast application of another SCOTTS COMPANY product was submitted to the Environmental Protection Agency ("EPA") by THE SCOTTS COMPANY and was approved by the EPA for inclusion on the Product label.  For example:

> 26. Fire Ant 2/Two Step: Mound plus/+/&/and Broadcast
> 27. Use a two-step method/process against fire ants: Mound and/& (plus/+)
> broadcast
> 28. Fire Ant 2-Step [Method]
> 29. Step 1 [:Mound Treatment]
> 30. Step 2 [:Broadcast Treatment]
> 31. Step 1: Kill the Mound
> 32. Step 2: Protect the Ground
> 33. Fire Ant 2-Step [Method]: Step 1 (mound treatment) + Step 2 (broadcast)
> 34. Use [this product] with a registered product for broadcast treatment [As part
> of the Fire Ant 2 Step]

EPA Registration Number: 239-2632, Decision Number: 514959, June 27, 2016, at 5.  A copy of the EPA's June 27, 2016, Decision Number: 514959 is attached hereto as **Exhibit "F,"** and is incorporated herein by reference.

49.     THE SCOTTS COMPANY voluntarily, and at THE SCOTTS COMPANY's option, chose not to include the EPA approved label language disclosing more information about the two-step process.

50.     THE SCOTTS COMPANY's intentional omission of the EPA approved label language regarding the 2-step process has contributed to the deceptive, misleading and unfair marketing of the Product.

51.     The failure to disclose the fact that the Product will not rid a yard of fire ants without Broadcast Granules also being applied and that the Product will not treat up to the promised number of mounds, consumers unknowingly purchase a product that will

not meet reasonable expectations and which may be altogether ineffective in ridding a yard of fire ants.  In fact, if the label of the Broadcast granules is true it can kill the mound more quickly (15 minutes) and also protect the yard against mound relocation; thus, there is no need for Product at all.

52.     Counsel for Plaintiffs provided notice of the Product's deceptive labeling through a Notice Letter which they sent WALMART, and which enclosed Plaintiffs' independent laboratory testing.  *See* Ex. "G."  This Notice Letter additionally contained a detailed explanation as to why the Product was false, deceptive, and misleading in violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Florida Statutes §§ 501.201, *et seq*.

53.     Despite WALMART's actual knowledge, as a result of its receipt of the Notice Letter, that the Product's labeling was deceptive, it continued to market, advertise, sell, and profit from the deceptively labeled Product by, among other things, continuing to market, advertise, and sell it in stores throughout Florida and the United States through the present date, just as it had before receiving the Notice Letter.

54.     During the class period, THE SCOTTS COMPANY has sold millions of units of the Product, equating to hundreds of millions of dollars in sales proceeds to THE SCOTTS COMPANY, by making false promises to consumers that the Product **"TREATS UP TO 162 MOUNDS"** and that the Product alone **"KILLS THE QUEEN & DESTROYS THE MOUND."**

55.     Since WALMART obtained actual knowledge of the deceptiveness of the Product's labeling, and elected to continue to market, advertise, and sell the Product to consumers with the deceptive labeling still prominently depicted on the Product,

WALMART has, upon information and belief, sold tens-of-thousands of units of the Product, thereby selling to WALMART's consumers a Product WALMART knew contained promises that were false, deceptive, and misleading.

56.     Plaintiffs are aggrieved by the deceptively labeled and marketed Product as they relied on the misleading and deceptive labeling and advertising and were deprived of the benefit of the bargain they reasonably anticipated from the Product's labeling and advertising; specifically, they were deprived of the benefit that they paid for a Product that was advertised as being capable of treating 162 fire ant mounds, when in fact, expert testing establishes that the Product provides 13% fewer fire ant mound treatments than represented to consumers on the Product's label.

57.     Similarly, Plaintiffs were also aggrieved by the deceptively labeled and marketed Product as they relied on the misleading and deceptive labeling and advertising and were deprived of the benefit of the bargain they reasonably anticipated from the Product's labeling and advertising; specifically, they were deprived of the benefit that they paid for a Product that was labeled and advertised for **KILLING THE QUEEN & DESTROYING THE MOUND**, when in reality the Product is not capable, standing alone of **KILLING THE QUEEN & DESTROYING THE MOUND**.

58.     Reasonable consumers, such as the Plaintiffs, will continue to be aggrieved by the deceptive and misleading labeling and advertising of the Product, as reasonable consumers will continue to believe that they are purchasing a Product that, by itself, **"KILLS THE QUEEN & DESTROYS THE MOUND."**  THE SCOTTS COMPANY was freely able to include the need for a "Two Step" process on the label of the Product.  This information was factually true and approved by the EPA for inclusion on the label.  THE

SCOTTS COMPANY chose to omit this information to deceive consumers and trick them into buying a product that did not have the claimed efficacy.

59.     Similarly, consumers, such as the Plaintiffs, will continue to be aggrieved by the deceptive and misleading labeling and advertising of the Product, as reasonable consumers will continue to believe that they are purchasing a Product that is capable of treating **"162 MOUNDS."**

60.     Upon information and reasonable belief, THE SCOTTS COMPANY could sell the Product without deceptive labeling by, for example, accurately informing consumers that the Product, by itself, does not **KILL THE QUEEN & DETROY THE MOUND**.  Stated differently, THE SCOTTS COMPANY could accurately label the Product using the language that has been approved by the EPA since 2016 such that consumers would be clearly advised that the consumers need to purchase additional and different products/chemicals and need to use those additional products/chemicals along with the Product in order to **KILL THE QUEEN & DETROY THE MOUND**.

61.     Additionally, THE SCOTTS COMPANY could sell the Product with an accurate representation as to the number of mounds it is actually capable of treating, or to exclude any representations regarding a specific number of mounds.

62.     Upon information and reasonable belief WALMART could sell the Product without deceptive labeling by, for example, ensuring that THE SCOTTS COMPANY corrects the Product label before WALMART continues to sell it.

63.     The Product was and remains a deceptively marketed and labeled Product under Florida law because the Product's labeling made and makes false and/or misleading representations.  Specifically, the Product represented that it **"KILLS THE**

**QUEEN & DESTROYS THE MOUND,"** when in fact the Product, used by itself, does not **"KILL[] THE QUEEN & DESTROY[] THE MOUND."**

64.     The Product was also a deceptively marketed and labeled Product under Florida law because the Product's labeling made false and/or misleading representations. Specifically, the Product represented that it **"TREATS UP TO 162 MOUNDS"** when in fact the Product cannot do so.

65.     THE SCOTTS COMPANY unlawfully and deceptively marketed, advertised, sold, and distributed the Product to Florida purchasers, because the Product contained deceptive labeling.  Labeling made deceptive by (1) the factual inaccuracy of the claim that the Product can treat up to 162 mounds; and (2) THE SCOTTS COMPANY's intentional omission from the Product label of the truthful, EPA-approved and material language advising the consumer that two steps and a second product will have to be used to actually get rid of the fire ants.

66.     After receiving counsel for Plaintiff's Notice Letter, WALMART unlawfully and deceptively marketed, advertised, sold, and distributed the Product to Florida purchasers, because after its receipt of said Notice Letter, WALMART knew the Product contained deceptive labeling, but made the decision to continue to market, advertise, and sell it anyway thereby constituting WALMART's own unlawful and deceptive practice.

67.     Defendants sold the Product at a premium price, and the Product's false and misleading representations deceived and continue to deceive Florida consumers for the reasons previously alleged above.

68.     Had THE SCOTTS COMPANY not approved, authorized, and participated in the advertising, marketing, labeling, and sale of a Product containing the above-

referenced deceptive representations, Plaintiffs and the other Class members would not have been economically injured because Plaintiffs and the other Class members would not have purchased the Product. Indeed, according to the label of the second step product—the Broadcast Granules—that product alone can kill the queens, destroy the mound and rid the consumer of fire ants alone, without the need for the Product at all.

69. If WALMART had not approved, authorized, and participated in the advertising, marketing, and sale of a Product containing the above-referenced deceptive representations, upon WALMART's obtaining actual knowledge of these deceptive representations upon receipt of Plaintiff's Notice Letter, Class members would not have been injured because Plaintiffs and the other Class members would not have purchased the Product.

70. As an immediate, direct, and proximate result of the Product's false, misleading, and deceptive representations, THE SCOTTS COMPANY injured Plaintiffs, and the other Class members in that Plaintiffs and other Class members:

    (a)    paid a sum of money for the Product that was not as represented;

    (b)    paid a premium price for the Product that was not as represented;

    (c)    were deprived the benefit of the bargain because the Product they purchased was different than what THE SCOTTS COMPANY warranted;

    (d)    were deprived the benefit of the bargain because the Product they purchased had less value than what was represented by THE SCOTTS COMPANY;

    (e)    did not receive a Product that measured up to their expectations as

created by THE SCOTTS COMPANY;

    (f)    purchased a Product that was other than what was represented by THE SCOTTS COMPANY;

    (g)    received a Product that Plaintiffs and the other members of the Class did not expect or consent to; and

    (h)    received a Product that was of a lower quality than what THE SCOTTS COMPANY promised.

71.    As an immediate, direct, and proximate result of the Product's false, misleading, and deceptive representations, WALMART injured Plaintiffs, and the other Class members in that Plaintiffs and other Class members:

    (a)    paid a sum of money for the Product that was not as represented;

    (b)    paid a premium price for the Product that was not as represented;

    (c)    were deprived the benefit of the bargain because the Product they purchased was different than what Defendants warranted;

    (d)    were deprived the benefit of the bargain because the Product they purchased had less value than what was represented by Defendants;

    (e)    did not receive a Product that measured up to their expectations as created by Defendants;

    (f)    purchased a Product that was other than what was represented by Defendants;

    (g)    received a Product that Plaintiffs and the other members of the Class did not expect or consent to; and

    (h)    received a Product that was of a lower quality than what Defendants

promised.

72.     Based on the Product's deceptive representations about the number of "mounds" the Product is capable of treating, and that the Product kills the queen and destroys the mound, Plaintiffs purchased a Product which they believed would work as promised. However, because the Product does not perform as promised, Plaintiffs were cheated out of the money they paid to purchase the Product, as well as the benefit that Plaintiffs intended (based on the Product's representations) to receive.

73.     Plaintiffs are repeat consumers of products that purportedly kill fire ants, and had used Orthene fire ant killer products prior to learning of the Product's deceptive representations. Once he/she learned of the deceptive labeling of the Product, he/she stopped purchasing it.

74.     Plaintiffs and the other Class members would likely purchase the Product again if they believed the deceptive Product labeling had been corrected.

75.     Because Defendants continue to advertise, market, and sell the deceptively labeled Product, there is a risk that Plaintiffs and other Class members could purchase the Product again, mistakenly believing the deceptive Product labeling had been corrected.

76.     Additionally, the label should be corrected to contain the EPA approved language regarding the two-step process and to accurately report the number of mounds the Product can treat.

77.     Including this information would provide consumers with access to truthful information from which to make comparisons between the Product and competing products, which is one of the overarching purposes of FDUTPA.

78.     Plaintiffs, as well as the other putative class members, are continuing consumers of fire ant control products and are subject to continuing harm if they are deprived of truthful information about the Product that would allow them both now, and in the future, to make informed purchasing decisions.

79.     Plaintiffs have no way of knowing if or when THE SCOTTS COMPANY makes changes to the Product and whether the Product's labeling remains deceptive. For example, THE SCOTTS COMPANY could change the contents of the Product and Plaintiffs would have no way of knowing if the Product's representations about the number of mounds the Product is capable of treating are deceptive other than to purchase the Product and evaluating it through personal trial.

80.     Accordingly, Plaintiffs and all other consumers purchasing the Product in Florida have been, are, and will continue to be aggrieved by the Product and are being deprived of the benefit of the bargain they reasonably anticipated from the Product labeling.

81.     Plaintiffs have performed all conditions precedent to bringing this Action.

**PLAINTIFFS' RELIANCE AND DAMAGES**

82.     Plaintiffs purchased one or more of the Product in Broward County, Florida, during the Class Period as Plaintiff, AMANDA PEREZ, purchased the Product on or about February 2, 2023, and Plaintiff, MICHAEL GREGORIO, purchased the Product on or about February 3, 2024.

83.     The Product purchased by Plaintiffs was deceptively advertised and marketed for the reasons previously alleged herein.

84.     With respect to the Product, Plaintiffs and members of the Class paid a price premium or received less than they bargained for, for the reasons fully set forth herein.

85.     Likewise, if Plaintiffs and members of the Class had known that the Product is not able to kill the queen and destroy the mound or able to treat up to 162 mounds, as specified on the label and in the advertising, they would not have purchased the Product or would have paid less for the Product.

86.     The Product is worth less than what Plaintiffs and members of the Class paid for, and/or is not what Plaintiffs and members of the Classes reasonably intended to receive.

87.     Plaintiffs bring this class action pursuant to Fed R. Civ. P. 23 and all other applicable laws and rules, individually and on behalf of all members of the following Class:

**SCOTTS Class**

**All persons throughout Florida, who, within the four years preceding the filing of the original Complaint ("Class Period"), purchased one or more containers of the Product for personal use and not resale.**

**WALMART Subclass**

**All persons throughout Florida, who, from November 1, 2023, and continuing until court approval of this class is obtained, purchased one or more containers of the Product from WALMART for personal use and not resale.**

88.     Excluded from the Class are Defendants, its subsidiaries, affiliates, and employees; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge(s) to whom this case is assigned and any immediate family members thereof.

89.     Certification of Plaintiffs' claims for class-wide treatment is appropriate

because Plaintiffs can prove the elements of Plaintiffs' claims on a class-wide basis using the same evidence as would be used to prove those claims in individual actions alleging the same claims.

### A. Numerosity

90.    The members of the Class are so numerous that individual joinder of all class members is impracticable.

91.    The precise number of members of the Class is unknown to Plaintiffs, but the number greatly exceeds the number that would make joinder practicable, particularly given Defendants' comprehensive distribution and sales network throughout Florida.

92.    Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

### B. Commonality and Predominance

93.    This Action involves common questions of law or fact, which predominate over any questions affecting individual members of the Class. All members of the Class were exposed to the deceptive practices of Defendants, as alleged herein.

94.    Furthermore, common questions of law or fact include:

   a.    whether Defendants engaged in the conduct as alleged herein;

   b.    whether Defendants' practices violate applicable law cited herein;

   c.    whether Plaintiffs and the other members of the Class are entitled to actual, statutory, or other forms of damages, and/or other monetary relief; and

d.      whether Plaintiffs and the other members of the Class are entitled to equitable relief, including but not limited to injunctive relief.

95.      Defendants engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually, and on behalf of the other members of the Class. Materially identical business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

### C. Typicality

96.      Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all members of the Class were comparably injured through the same uniform misconduct described herein. Further, there are no defenses available to Defendants that are unique to Plaintiffs' claims.

### D. Adequacy of Representation

97.      Plaintiffs are adequate representatives of the members of the Class because Plaintiffs' interests do not conflict with the interests of the other members of the Class that Plaintiffs seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel. Undersigned counsel has represented consumers in a wide variety of actions where they have sought to protect consumers from fraudulent and deceptive practices.

## E. Declaratory and Injunctive Relief

98.     Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the members of the Class as a whole.

## F. Superiority

99.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if the members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments; and increases the delay and expense to all parties and the court system and thereby unnecessarily clogging of dockets.

100.    By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Given the similar nature of the members of the Class's claims and the absence of material or dispositive differences in laws upon which the claims are based, the Class will be easily managed by the Court and the parties.

**FIRST CAUSE OF ACTION:**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE**
**PRACTICES ACT, FLA STAT. § 501.201 et seq.**
**(versus THE SCOTTS COMPANY)**

101.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Class Action Complaint as if fully set forth herein verbatim.

102.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 501.213, *Florida Statutes*.

103.    The express purpose of FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Section 501.202(2), *Florida Statutes*.

104.    Section 501.204(1), *Florida Statutes* declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

105.    The sale of the Product at issue in this cause was "consumer transactions" within the scope of FDUTPA.

106.    Plaintiffs are each a "consumer" as defined by Section 501.203, *Florida Statutes.*

107.    The Product is a good within the meaning of FDUTPA and THE SCOTTS COMPANY is engaged in trade or commerce within the meaning of FDUTPA.

108.    THE SCOTTS COMPANY's unfair and deceptive practices are likely to mislead—and have misled—reasonable consumers, such as Plaintiffs and members of

the Class, and therefore, violate Section 500.04, *Florida Statutes*.

109.   THE SCOTTS COMPANY has violated FDUTPA by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

110.   Specifically, THE SCOTTS COMPANY marketed, labeled and advertised the Product in a deceptive, false and misleading manner since the representations contained on the Product cause reasonable consumers of the Product to believe the Product, when used by itself, **"KILLS THE QUEEN & DESTROYS THE MOUND,"** when in fact the Product, used by itself, does not **"KILL[] THE QUEEN & DESTROY[] THE MOUND."**

111.   The Product was also a deceptively marketed and labeled Product under Florida law because the Product's labeling made false and/or misleading representations. Specifically, although the Product represented that it **"TREATS UP TO 162 MOUNDS"** when in fact the Product cannot do so.

112.   Plaintiffs and Class Members have been aggrieved by THE SCOTTS COMPANY's unfair and deceptive practices in violation of FDUTPA, in that they purchased the deceptively labeled and marketed Product.

113.   Reasonable consumers rely on THE SCOTTS COMPANY to honestly market and label the Product in a way that does not deceive reasonable consumers into believing they are purchasing a Product that **"KILLS THE QUEEN & DESTROYS THE MOUND,"** and **"TREATS UP TO 162 MOUNDS,"** when the truth is that the Product does not do so.

114.   THE SCOTTS COMPANY has deceived reasonable consumers, like

Plaintiffs and the Class, into believing the Product was something it was not.

115.    Plaintiffs and the Class suffered damages and are entitled to injunctive relief.

116.    Pursuant to sections 501.211(2) and 501.2105, *Florida Statutes*, Plaintiffs and the Class make claims for damages, attorney's fees, and costs. The damages suffered by the Plaintiffs and the Class were directly and proximately caused by the deceptive, misleading, and unfair practices of THE SCOTTS COMPANY. Additionally, pursuant to Section 501.211(1), *Florida Statutes*, Plaintiffs and the Class seek injunctive relief for, *inter alia*, the Court to enjoin THE SCOTTS COMPANY's above-described wrongful acts and practices, and for restitution and disgorgement.

117.    Plaintiffs seek all available remedies, damages, and awards resulting from THE SCOTTS COMPANY's violations of FDUTPA.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, individually, and on behalf of all others similarly situated, prays for relief pursuant to each cause of action set forth in this Complaint as follows:

A.    For an order certifying that the Action may be maintained as a class action, certifying Plaintiffs as representatives of the Class, and designating Plaintiffs' attorneys as Class counsel;

B.    For an award of equitable relief for all causes of action as follows:

        1.    Enjoining THE SCOTTS COMPANY from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to the design, testing, manufacture, assembly, development, marketing, advertising, or sale of the Product for the purpose of

selling the Product in such manner as set forth in detail above, or from making any claims found to violate FDUTPA or the other causes of action as set forth above;

2.    Restoring all monies that may have been acquired by THE SCOTTS COMPANY as a result of such unfair and/or deceptive act or practices; and

C.    For actual damages in an amount to be determined at trial for all causes of action;

D.    For an award of attorney's fees and costs;

E.    For any other relief the Court might deem just, appropriate, or proper; and

F.    For an award of pre and post-judgment interest on any amounts awarded.

**SECOND CAUSE OF ACTION:**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE**
**PRACTICES ACT, FLA STAT. § 501.201 et seq.**
**(versus WALMART)**

118.    Plaintiff, MICHAEL GREGORIO, re-alleges and incorporates by reference the allegations set forth in the paragraphs one (1) through one hundred (100) of this Class Action Complaint as if fully set forth herein verbatim.

119.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 501.213, *Florida Statutes*.

120.    The express purpose of FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Section 501.202(2), *Florida Statutes*.

121.    Section 501.204(1), *Florida Statutes* declares as unlawful "unfair methods

of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

122.    The sale of the Product at issue in this cause was "consumer transactions" within the scope of FDUTPA.

123.    Plaintiff, and putative class members, are each a "consumer" as defined by Section 501.203, *Florida Statutes.*

124.    The Product is a good within the meaning of FDUTPA and WALMART is engaged in trade or commerce within the meaning of FDUTPA.

125.    WALMART's unfair and deceptive practices are likely to mislead—and have misled—reasonable consumers, such as Plaintiff and members of the Class, and therefore, violate Section 500.04, *Florida Statutes*.

126.    WALMART has violated FDUTPA by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.  Specifically, as described in detail herein, WALMART sold the Product after it received notice (i.e. actual knowledge) of the deceptive representations contained on the Product's labeling. WALMART's sales of a Product it knew to be deceptively labeled is a violation of FDUTPA.

127.    WALMART's actions of marketing and advertising the Product constituted a deceptive, false and misleading action since it knew the representations contained on the Product cause reasonable consumers of the Product to believe the Product, when used by itself, **"KILLS THE QUEEN & DESTROYS THE MOUND,"** when in fact the Product, used by itself, does not  **"KILL[] THE QUEEN & DESTROY[] THE MOUND."**

128.   WALMART's actions of marketing and advertising the Product constituted a deceptive, false and misleading action since it knew the representations contained on the Product cause reasonable consumers of the Product to believe the Product contains enough dry acephate powder / "Orthene fire ant killer1" to treat the "162 MOUNDS" as promised when following the instructions provided, when the Product does not in fact contain enough dry acephate powder / "Orthene fire ant killer" to treat the "162 MOUNDS" as promised.

129.   Plaintiff, MICHAEL GREGORIO, and WALMART Class Members have been aggrieved by WALMART's unfair and deceptive practices in violation of FDUTPA, in that they purchased the deceptively labeled and marketed Product.

130.   Reasonable consumers rely on WALMART to honestly market and label the Product in a way that does not deceive reasonable consumers into believing they are purchasing a Product that **"KILLS THE QUEEN & DESTROYS THE MOUND,"** and **"TREATS UP TO 162 MOUNDS,"** when the truth is that the Product does not do so.

131.   WALMART has deceived reasonable consumers, like Plaintiff, MICHAEL GREGORIO, and the Class, into believing the Product was something it was not.

132.   Plaintiff, MICHAEL GREGORIO, and the WALMART Class Members suffered damages and are entitled to injunctive relief.

133.   Pursuant to sections 501.211(2) and 501.2105, *Florida Statutes*, Plaintiff, MICHAEL GREGORIO, and the WALMART Class Members make claims for damages, attorney's fees, and costs. The damages suffered by the Plaintiff and the Class were directly and proximately caused by the deceptive, misleading, and unfair practices of WALMART. Additionally, pursuant to Section 501.211(1), *Florida Statutes*, Plaintiff and

the Class seek injunctive relief for, *inter alia*, the Court to enjoin WALMART's above-described wrongful acts and practices, and for restitution and disgorgement.

134.    Plaintiff, MICHAEL GREGORIO, seeks all available remedies, damages, and awards resulting from WALMART's violations of FDUTPA.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, MICHAEL GREGORIO, individually, and on behalf of all others similarly situated, prays for relief pursuant to each cause of action set forth in this Complaint as follows:

A.    For an order certifying that the Action may be maintained as a class action, certifying Plaintiff as representative of the Class, and designating Plaintiff's attorneys as Class counsel;

B.    For an award of equitable relief for all causes of action as follows:

1.    Enjoining WALMART from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to the design, testing, manufacture, assembly, development, marketing, advertising, or sale of the Product for the purpose of selling the Product in such manner as set forth in detail above, or from making any claims found to violate FDUTPA or the other causes of action as set forth above;

2.    Restoring all monies that may have been acquired by WALMART as a result of such unfair and/or deceptive act or practices; and

C.    For actual damages in an amount to be determined at trial for all causes of action;

D.     For an award of attorney's fees and costs;

E.     For any other relief the Court might deem just, appropriate, or proper; and

F.     For an award of pre and post-judgment interest on any amounts awarded.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable.

Submitted this 2nd day of April, 2024.

SOUTHERN ATLANTIC LAW GROUP, PLLC

By:  s/Nicholas T. Zbrzeznj
       Lydia S. Zbrzeznj
       Florida Bar No. 98181
       Nicholas T. Zbrzeznj
       Florida Bar No. 98180
       290 1st Street S
       Winter Haven, FL 33880
       Telephone: (863)656-6672
       Facsimile: (863)301-4500
       Emails: lydia@southernatlanticlaw.com
       nick@southernatlanticlaw.com
       kara@southernatlanticlaw.com
       mark@southernatlanticlaw.com
       ATTORNEYS FOR PLAINTIFFS